UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY STATHIS,<br><br>               Plaintiff,<br><br><br>   vs.<br><br>MARTY INDIAN SCHOOL BOARD INC., A<br>SOUTH DAKOTA NONPROFIT<br>CORPORATION,<br><br>               Defendant. | 4:20-CV-04174-RAL<br><br><br><br>OPINION AND ORDER GRANTING<br>MOTION TO DISMISS |

Plaintiff Timothy Stathis was the high school principal at the Marty Indian School (MIS), an entity of the Yankton Sioux Indian Tribe (Tribe). The Marty Indian School Board (the Board) terminated Stathis in late 2017 after a dispute over Stathis's administration of federal grant funds. Stathis sued the Board in this Court, alleging unlawful retaliation under 42 U.S.C. § 1981, wrongful termination, breach of employment contract, and breach of settlement agreement. Doc. 1. The Board moved to dismiss, arguing that it enjoys sovereign immunity and that Stathis failed to state a claim. Doc. 6. Because tribal sovereign immunity applies to the Board, this Court grants the Board's motion to dismiss.

I.      **Facts**

The Tribe is a federally recognized Indian tribe located in South Dakota. Acting through its governing body, the Yankton Sioux Tribe Business and Claims Committee, the Tribe chartered MIS by approving the MIS Constitution and Bylaws in November 2013. Doc. 8-1. The MIS

Constitution describes MIS as a "legal entity of the Yankton Sioux Tribe, from whom Marty Indian School, Inc., has been delegated authority to operate and maintain the Marty Indian School." Doc. 8-1 at 2.  The MIS Bylaws identify Marty Indian School, Inc. as "a legal entity of the Yankton Business and Claims Committee." Doc. 8-1 at 14.  The Bureau of Indian Education funds MIS via federal grants, Doc. 1 at ¶ 5, and MIS is located on trust land within the Yankton Sioux Indian Reservation, <u>Marty Indian Sch. Bd., Inc. v. South Dakota</u>, 824 F.2d 684, 685 (8th Cir. 1987); Doc. 1 at ¶ 4.  According to a grant application Stathis attached to his complaint, MIS "has been a tribally owned and operated school since" 1975.  Doc. 1-2 at 4.

The MIS Constitution names the Board as the governing body of Marty Indian School, Inc. Doc. 8-1 at 2.  The Board has the "sole and exclusive right to the management and administrative control of the Marty Indian School System" and "establish[es] policy for" MIS.  Doc. 8-1 at 14. Eligibility to serve on the five-member Board is "limited to enrolled Yankton Sioux Tribal members and any Native American person living within the exterior boundaries of the Yankton Sioux Reservation." Doc. 8-1 at 3.  Voting in Board elections is limited to Tribal members living within "the area known as the 1858 Boundaries." Doc. 8-1 at 5.

In May 2017, Stathis signed a contract to serve as MIS's high school principal for the 2017–2018 school year. Doc. 1 at ¶ 6; Doc. 8-3.[1]  The contract states that it is between Stathis and "Marty Indian School Board, Inc., a non-profit South Dakota corporation." 8-3 at 1.  However, while "Marty Indian School Board, Inc." was previously incorporated as a nonprofit under the laws of South Dakota,[2] the South Dakota Secretary of State administratively dissolved that

---

[1]Stathis attached a contract to his complaint, but that contract was for the 2016–2017 school year. Doc. 1-1.  The Board filed the relevant contract for the 2017–2018 school year.  Doc. 8-3.
[2]The page from the South Dakota Secretary of State's website the Board filed lists April 30, 1976, as the initial filing date for Marty Indian School Board, Inc.  Doc. 8-2.

corporation on April 20, 2015. Doc. 8 at ¶ 2; Doc. 8-2. Stathis claims the Board held itself out as a South Dakota nonprofit corporation "at all times relevant to this action." Doc. 1 at ¶ 4.

Stathis was to receive a $70,000 salary under the contract, with his term of employment beginning in August 2017 and ending on June 30, 2018. Doc. 8-3 at 1. If the contract was "terminated for any cause or reason," Stathis was to be paid "a pro rata amount" of his salary "that the time employed bears to the employment term." Doc. 8-3 at 2. The contract included the following figures under the heading "BUY OUT CLAUSE:"

> $500.00 thru June 2017
> $1,000.00 thru July 2017
> $1,500.00 from August 2017 thru school year.

Doc. 8-3 at 3.

As principal, Stathis administered school improvement grants issued by the Bureau of Indian Education. Doc. 1 at ¶ 10. According to Stathis, the grants were to be used as performance bonuses for teachers whose students showed academic improvement. Doc. 1 at ¶ 11; Doc. 1-2. Stathis designed a system under which higher-performing faculty received larger bonuses than lower-performing faculty. Doc. 1 at ¶ 12. Stathis's system, and his refusal to alter it, led to an escalating dispute with those deemed to be lower-performing MIS faculty, the Board, and members of the local community. Doc. 1 at ¶¶ 13–15, 17.

This dispute boiled over on November 15, 2017, when those opposed to Stathis's actions held a sit-in demonstration in the school library. Doc. 1 at ¶¶ 18–19. The Board attended the demonstration and, later that day, held an executive session during which it questioned Stathis. Doc. 1 at ¶¶ 19–20. The following evening, the MIS superintendent informed Stathis that he was suspended from work for ten days. Doc. 1 at ¶ 21. The suspension was to be unpaid, but the Board later agreed to pay Stathis for these ten days after he filed a grievance. Doc. 1 at ¶¶ 22–23, 31.

Stathis resumed work at the end of November but only for one day.  Doc. 1 at ¶¶ 24–26.
On December 1, 2017, the Board met and decided to terminate Stathis's employment.  Doc. 1 at ¶
26.  Stathis alleges that the Board offered to pay out the salary he had remaining under his contract
and that he accepted this offer.  Doc. 1 at ¶ 26.  Stathis returned to the school later that month and
was given a check for the remainder of his contract.  Doc. 1 at ¶¶ 27–29.  Before Stathis could
leave the building, however, the MIS superintendent ordered him to return the check or a stop
payment order would be entered.  Doc. 1 at ¶¶ 29–30.  Stathis surrendered the check and tribal
police escorted him off school property.  Doc. 1 at ¶ 30.  Stathis claims that the Board eventually
offered him $1,500 as a "full and final settlement," but he rejected this offer.  Doc. 1 at ¶ 32.

According to Stathis, he remained unemployed until August 13, 2018, when he started
teaching school in California.  Doc. 1 at ¶¶ 33–36.  Stathis had looked for work as a school
administrator or principal but was unsuccessful.  Doc. 1 at ¶¶ 34–36.

Stathis ultimately sued MIS and four members of the Board in South Dakota state court,
alleging breach of contract, breach of settlement agreement, wrongful termination, libel, and
slander.  Stathis v. Marty Indian Sch., 930 N.W.2d 653, 655, 657 (S.D. 2019).  A state trial court
dismissed Stathis's suit based on tribal sovereign immunity, immunity of tribal officials and
employees, federal preemption, and infringement of tribal sovereignty.  Id. at 658.  The Supreme
Court of South Dakota affirmed solely on the ground that federal law preempted state court
jurisdiction over Stathis's suit.  Id. at 659–61.  The court found that the Self-Determination Act
and the Tribally Controlled Schools Act—both of which expressly call for more tribal and
community control over the education of Indian children—"show a clear intent of Congress to
preempt state court entanglement into the education of Indians living on the reservation."  Id. at
660–61.

4

Stathis then filed this action against the Board. Doc. 1. He alleged claims for retaliation under 42 U.S.C. § 1981 (Count One), wrongful termination (Count Two), breach of employment contract (Count Three), and breach of settlement agreement (Count Four). Doc. 1. He sought damages for "an amount equivalent to the remainder" of his contract when he was terminated, lost wages for the time between his termination and his new job in California, attorney's fees and punitive damages under Count One, and prejudgment interest. Doc. 1.

The Board moved to dismiss Stathis's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 6. The Board argued that tribal sovereign immunity bars Stathis's complaint, that all of the counts in the complaint fail to state a claim, that Stathis has not exhausted available tribal court remedies, and that neither diversity of citizenship nor supplemental jurisdiction provide a basis to hear Stathis's nonfederal claims. Docs. 6, 7.

## II.   Standard of Review

Federal Rule of Civil Procedure 12(b)(1) concerns dismissal of a suit for lack of subject matter jurisdiction whereas Rule 12(b)(6) addresses dismissal for failure to state a claim. As explained more fully below, this Court elects to decide this case based on tribal sovereign immunity.[3] In the Eighth Circuit, motions to dismiss on sovereign immunity grounds may be analyzed under Rule 12(b)(1), Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1042–43 (8th Cir. 2000), although such motions raise a jurisdictional issue separate from subject matter

---

[3]Deciding the sovereign immunity issue first is appropriate even though the Board also argues that Stathis fails to state a claim under 42 U.S.C. § 1981 and that neither diversity jurisdiction nor supplemental jurisdiction provides a basis to hear Stathis's nonfederal claims. See Florida v. Seminole Tribe of Fla., 181 F.3d 1237, 1240 n.4 (11th Cir. 1999) ("Because of its jurisdictional nature, we must consider the Tribe's claim of sovereign immunity before reaching the issue of failure to state a claim."); Estate of Soler v. Rodriguez, 63 F.3d 45, 47 n.1 (1st Cir. 1995) ("Where both federal jurisdiction and the existence of a federal claim turn upon whether the complaint states a federal question, the preferable practice is to assume that jurisdiction exists and proceed to determine whether the claim passes muster under Rule 12(b)(6).").

jurisdiction, Johnson v. Prairie Island Dakota Sioux (In Re Prairie Island Dakota Sioux), 21 F.3d 302, 304–05 (8th Cir. 1994) (per curiam). The Board makes a factual attack on Stathis's complaint, challenging the jurisdictional facts Stathis alleged and submitting an affidavit and exhibits to support its argument that it is immune from suit. See Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) ("A factual attack . . . is an argument that there is no subject matter jurisdiction because the facts of the case . . . do not support the asserted jurisdiction."). Under a factual attack, no presumptive truthfulness attaches to the plaintiff's allegations, and courts may weigh and consider evidence outside the pleadings. Osborn v. United States, 918 F.2d 724, 729–30 (8th Cir. 1990).

On a Rule 12(b)(6) motion, courts must accept a plaintiff's factual allegations as true and construe all inferences in the plaintiff's favor, but need not accept a plaintiff's legal conclusions. Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012). To survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are unnecessary, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Still, "conclusory statements" and "naked assertion[s] devoid of further factual

enhancement" do not satisfy the plausibility standard. Iqbal, 556 U.S. at 678 (alteration in original) (citation and internal marks omitted).

## III.   Analysis

### A.  Tribal Sovereign Immunity and Exhaustion of Tribal Court Remedies

Indian tribes are considered "domestic dependent nations" that possess "inherent sovereign authority over their members and territories." Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 509 (1991) (cleaned up and citation omitted). This sovereignty underlies both the doctrine of tribal sovereign immunity and the doctrine of exhaustion of tribal court remedies. Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 788–89 (2014); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 33 (1st Cir. 2000); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1507 (10th Cir. 1997). First, Indian tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978). Sovereign immunity thus bars suits against Indian tribes "absent a clear waiver by the tribe or congressional abrogation." Okla. Tax Comm'n, 498 U.S. 505 at 509. A tribe's sovereign immunity may extend to a tribal entity or agency, as well as a corporation. J.L. Ward Assocs. v. Great Plains Tribal Chairmen's Health Bd., 842 F. Supp. 2d 1163, 1171–72, 1176–77 (D.S.D. 2012). Second, the tribal exhaustion doctrine recognizes that tribal courts are an important part of tribal sovereignty and self-determination. Iowa Mut. Ins. v. LaPlante, 480 U.S. 9, 14–18 (1987); Nat'l Farmers Union Ins. v. Crow Creek Tribe of Indians, 471 U.S. 845, 856 (1985); Ninigret Dev. Corp., 207 F.3d at 33 (explaining that the concern for tribal sovereignty "forms the epicenter of the tribal exhaustion doctrine"); Kerr-McGee Corp., 115 F.3d at 1507 ("The tribal exhaustion requirement created by National Farmers is based on comity concerns for Indian tribes in maintaining their remaining sovereignty."). This doctrine requires

7

litigants, in certain circumstances, to exhaust their remedies in tribal court before coming to federal court. Iowa Mut. Ins., 480 U.S. at 16–18; DISH Network Serv. LLC v. Laducer, 725 F.3d 877, 882–83 (8th Cir. 2013). The doctrine thus allows tribal courts to assert authority over reservation affairs without having to "compete" against federal courts for the right to do so. Iowa Mut. Ins., 480 U.S. at 16; Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Reservation, 27 F.3d 1294, 1299 (8th Cir. 1994).

Tribal sovereign immunity and exhaustion of tribal court remedies are both "threshold" issues under Eighth Circuit precedent. Amerind Risk Mgmt. Corp. v. Malaterre, 633 F.3d 680, 684 (8th Cir. 2011) ("[T]ribal sovereign immunity is a threshold jurisdictional question."); Gaming World Int'l Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 849 (8th Cir. 2003) ("The issue of tribal exhaustion is a threshold one because it determines the appropriate forum."). Some district court judges within this circuit have interpreted Davis v. Mille Lacs Band of Chippewa Indians, 193 F.3d 990 (8th Cir. 1999) (per curiam), as requiring exhaustion when a party raises tribal sovereign immunity as a defense. Romero v. Wounded Knee, LLC, CIV. 16-5024-JLV, 2018 WL 4279446, at *2 (D.S.D. Aug. 31, 2018) (citing Davis and stating that "the precedent of the . . . Eighth Circuit requires the court to enforce the exhaustion of tribal court remedies before fully analyzing tribal sovereign immunity"); id. at *4 ("The law of the Eighth Circuit is clear when a party raises tribal sovereign immunity as a defense and tribal court remedies are not exhausted: the case goes to tribal court."); Malaterre v. Amerind Risk Mgmt., 373 F. Supp. 2d 980, 982 n.3 (D.N.D. 2005) (citing Davis and stating that "[i]t has been established in the Eighth Circuit that tribal exhaustion precedes the tribal immunity inquiry"); see also Ninigret Dev. Corp, 207 F.3d at 28 (reading Davis as holding that the issue of tribal sovereign immunity must be exhausted in the

8

Eighth Circuit). That is, these judges read <u>Davis</u> as requiring federal courts to defer ruling on a defense of tribal sovereign immunity until that defense has been presented in tribal court.

But that was not the holding in <u>Davis</u>. Rather, the issue in <u>Davis</u> was whether a tribe's alleged waiver of sovereign immunity excused the tribal exhaustion requirement. The plaintiff in <u>Davis</u> sued a tribe and two of its officers under various federal and state laws. 193 F.3d at 991. The district court stayed the case so the plaintiff could bring an action in tribal court and exhaust her remedies there. <u>Id.</u> The tribal court dismissed most of the plaintiff's claims, and she failed to timely appeal that decision to the tribal appellate court. <u>Id.</u> The parties returned to federal court, and the district court granted the tribe's motion to dismiss based on the plaintiff's failure to exhaust and the tribal court having properly exercised jurisdiction over the case. <u>Id.</u> The plaintiff appealed to the Eighth Circuit, arguing that no exhaustion of tribal court remedies was necessary because the tribe had explicitly waived its sovereign immunity for her claims. <u>Id.</u> at 992. The Eighth Circuit disagreed:

> We do not read a purported waiver of sovereign immunity by the [Tribe] as doing away with the exhaustion requirement. In fact, the Supreme Court has stated that the issue of a tribe's sovereign immunity is the very kind of question that is to be decided in the first instance by the tribal court itself. <u>See</u> <u>National Farmers</u>, 471 U.S. at 855–56 ("[T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty . . . . We believe that examination should be conducted in the first instance in the Tribal Court itself.")[.]

<u>Davis</u>, 193 F.3d at 992. Thus, while the Eighth Circuit did say that a "tribe's sovereign immunity is the very kind of question that is to be decided in the first instance by the tribal court itself," that statement was dicta to its decision that a purported waiver of tribal sovereign immunity does not excuse exhaustion of tribal court remedies and that the district court properly dismissed the case for failure to exhaust.

9

Other reasons counsel against reading <u>Davis</u> as requiring exhaustion when a party raises tribal sovereign immunity as a defense. First, the passage from <u>National Farmers</u> quoted by the Eighth Circuit in <u>Davis</u> addressed whether tribes, as sovereigns, had been divested of the authority to exercise jurisdiction over non-Indians on reservations. <u>Nat'l Farmers</u>, 471 U.S. at 855–56. The passage did not concern tribal sovereign immunity from suit. <u>Ninigret Dev. Corp.</u>, 207 F.3d at 28 n.3 (explaining that the passage from <u>National Farmers</u> addressed "the dependent status of Indian tribes and the intergovernmental relationship between states and tribes, as opposed to sovereign immunity"). Second, the Eighth Circuit has decided the issue of tribal sovereign immunity without even mentioning the tribal exhaustion doctrine, let alone requiring that the issue first be exhausted in tribal court. <u>Hagen</u>, 205 F.3d at 1043–45 (holding that sovereign immunity barred federal civil rights suits against a community college chartered by a tribe without discussing exhaustion); <u>Dillon v. Yankton Sioux Tribe Hous. Auth.</u>, 144 F.3d 581, 583–84 (8th Cir. 1998) (holding that sovereign immunity barred federal civil rights suit against a tribal housing authority without mentioning exhaustion)[4]; <u>Rupp v. Omaha Indian Tribe</u>, 45 F.3d 1241, 1244–46 (8th Cir. 1995) (finding that a tribe had waived sovereign immunity without considering exhaustion); <u>see also</u> <u>Stanko v. Oglala Sioux Tribe</u>, 916 F.3d 694, 696–700 (8th Cir. 2019) (holding that sovereign immunity barred suit against tribe and tribal officials acting in their official capacities but dismissing individual capacity claims against officials for failure to exhaust).

This Court elects to resolve the sovereign immunity issue itself. To be sure, exhaustion must sometimes precede a ruling on sovereign immunity, such as when there are questions over

---

[4]The tribal housing authority in <u>Dillon</u> moved to dismiss the case based on sovereign immunity and failure to exhaust tribal court remedies. <u>Dillon v. Yankton Sioux Tribe Hous. Auth.</u>, 4:97-cv-04006-LLP, Doc. 15 (D.S.D. June 27, 1997). The district court converted the motion to one for summary judgment and granted the motion on the ground of sovereign immunity without deciding whether exhaustion was necessary. <u>Id.</u>

whether a contractual waiver of sovereign immunity was valid under tribal law. Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412, 1419–22 (8th Cir. 1996); Abdo v. Fort Randall Casino, 957 F. Supp. 1111, 1112–14 (D.S.D. 1997). But here there are no thorny issues of tribal law. Instead, much of this Court's analysis depends on state and federal law.

## B. The Board is Entitled to Sovereign Immunity

Entities or agencies that function as an "arm" of a tribe may share in that tribe's sovereign immunity. In Hagen, for instance, the Eighth Circuit held that a tribe's immunity extended to a college it created to provide education to tribal members on Indian land. Hagen, 205 F.3d at 1043. The tribe chartered the college under its constitution,[5] provided funding for it, and controlled it via a board of trustees composed of tribal members. Id. at 1042–43. Under these facts, the college served "as an arm of the tribe" rather than "a mere business." Id. at 1043. Similarly, the Eighth Circuit in Dillon held that a housing authority, established by a tribal council under its powers of self-government, was a tribal agency entitled to sovereign immunity "rather than a separate corporate entity created by the tribe." 144 F.3d at 583. Likewise, in Weeks Construction, Inc. v. Oglala Housing Authority, 797 F.2d 668 (8th Cir. 1986), the Eighth Circuit held that a housing authority established by a tribal ordinance to develop housing projects on the reservation was an arm of tribal government entitled to sovereign immunity. Id. at 670–71.

While the decisions in Hagen, Dillon, and Weeks are instructive, the Eighth Circuit has not established a specific test or set of factors to consider when deciding whether an organization is entitled to tribal sovereign immunity. J.L. Ward, 842 F. Supp. 2d at 1173. In J.L. Ward, however, this Court—looking to decisions like Wright v. Prairie Chicken, 579 N.W.2d 7 (S.D. 1998), Gavle

---

[5]The college was not incorporated under state law. Hagen v. Sisseton-Wahpeton Cmty. Coll., 1:97-cv-01005-CBK, Doc. 101 at 10 (D.S.D. Feb. 9, 1999).

v. Little Six, Inc., 555 N.W.2d 284 (Minn. 1996), and Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173 (10th Cir. 2010)—used a multi-factor test to decide whether a nonprofit corporation created by sixteen tribes enjoyed sovereign immunity. J.L. Ward, 842 F. Supp. 2d at 1171–77. The non-exhaustive factors this Court considered were: (1) the entity's method of creation; (2) the entity's purpose; (3) the entity's structure, ownership, and management, including the level of tribal control; (4) the tribe's intent to extend its sovereign immunity to the entity; (5) the financial relationship between the tribe and the entity; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entity.[6] Id. at 1176. Courts have referred to these factors as the "subordinate economic entity analysis" id. at 1173 (cleaned up and citation omitted), or the "arm-of-the-tribe" test, Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019). An analysis of these factors shows that the Tribe's immunity extends to the Board.

### 1. Method of Creation

This factor focuses "on the law under which the entities were formed." Williams, 923 F.3d at 177. Formation under tribal law favors sovereign immunity, id., while incorporation under state law can, at least in the Tenth Circuit, preclude an entity from sharing in a tribe's immunity, Somerlott v. Cherokee Nation Distribs., 686 F.3d 1144, 1149–50 (10th Cir. 2012). In J.L. Ward, this Court held that an entity created by a group of tribes to work with the federal government in providing health care to tribal members could claim sovereign immunity despite being a South Dakota nonprofit corporation. 842 F. Supp. 2d at 1171–77. Although the entity's incorporation

---

[6]In 2019, the Fourth Circuit concluded that "the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).

under state law disfavored sovereign immunity, this Court did not find it dispositive of sovereign immunity for the nonprofit entity. Id. at 1176–77. The Tenth Circuit took a different approach in Somerlott, concluding that a *for-profit* tribally owned chiropractic business could not claim sovereign immunity because the state statutes under which it was incorporated made it "legally distinct" from the tribe and allowed it to "sue [and] be sued" in court. 686 F.3d at 1149–50 (alterations and citation omitted). The Tenth Circuit noted its position that tribal sovereign immunity was coextensive with that of the United States, cited to cases denying immunity to federal entities incorporated under state law, and found no reason to apply a different principle to the chiropractic business.[7] Id. at 1150. In a footnote, the Tenth Circuit stated that J.L. Ward was "unpersuasive insofar as it would result in tribal sovereign immunity being broader than the sovereign immunity of the United States." Id. at 1149 n.3.

Whatever the wisdom of Somerlott,[8] the reasoning in that case does not apply here. The South Dakota Secretary of State administratively dissolved the South Dakota nonprofit corporation "Marty Indian School Board, Inc." on April 20, 2015. Doc. 8 at ¶ 2; Doc. 8-2. South Dakota has

---

[7] Justice Gorsuch, still with the Tenth Circuit at that time, wrote a concurrence expounding on this reasoning and explaining that "sovereign immunity has never extended to a for-profit business owned by one sovereign but formed under the laws of a second sovereign when the laws of the incorporating second sovereign expressly allow the business to be sued." Somerlott, 686 F.3d at 1154 (Gorsuch, J., concurring).

[8] Unlike the Tenth Circuit, other jurisdictions have allowed state corporations formed by Indian tribes to assert sovereign immunity, particularly when the entity is a nonprofit performing governmental functions. McCoy v. Salish Kootenai Coll., Inc., 785 F. App'x 414, 415 (9th Cir. 2019) (holding that a tribal college possessed sovereign immunity even though it was incorporated under state law); Cain v. Salish Kootenai Coll., Inc. CV-12-181-M-BMM, 2018 WL 2272792, at *1–4 (D. Mont. May 17, 2018) (extending sovereign immunity to college that was incorporated under both tribal and state law); Rassi v. Fed. Program Integrators, LLC, 69 F. Supp. 3d 288, 289, 291–92 (D. Me. 2014) (finding Somerlott distinguishable and holding that a Maine LLC enjoyed sovereign immunity where it was owned by an Indian Reorganization Act § 17 corporation and formed to advance governmental objectives); Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc., 658 N.E.2d 989, 991–95 (N.Y. 1995) (holding that a nonprofit corporation formed by a tribe under the law of the District of Columbia had tribal sovereign immunity).

a corporate survival statute requiring that a suit against a dissolved corporation be brought within two years of its dissolution. SDCL § 47-26-39;[9] M.S. v. Dinkytown Day Care Ctr., Inc., 485 N.W.2d 587, 589–91 (S.D. 1992) (per curiam) (concluding that § 47-26-39 is a survival statute). After the two years expires, the dissolved corporation ceases to be an entity that can be sued. Dinkytown Day Care, 485 N.W.2d at 588–91 (holding that a suit brought more than two years after a nonprofit corporation was dissolved was time barred). Marty Indian School Board, Inc. stopped being an entity that could be sued well before Stathis brought this suit. Thus, this case is not like Somerlott,[10] where state law expressly allowed the tribally owned business to be sued. Moreover, the state law in Somerlott provided that the business was a "separate legal entity" from its members. 686 F.3d at 1150 (citation omitted). In contrast, a nonprofit corporation in South Dakota that has been administratively dissolved "continues its corporate existence" but only to the

---

[9]Section 47-26-39 provides in relevant part that the "dissolution of a corporation . . . [b]y the issuance of a certificate of dissolution by the secretary of state . . . shall not take away or impair any remedy available to or against such corporation, its directors, officers, or members, for any right or claim existing, or any liability incurred prior to such dissolution if action or other proceeding thereon is commenced within two years after the date of such dissolution." SDCL § 47-26-39.

[10]The Somerlott corporation's status as a legally distinct entity was critical to the Tenth Circuit's decision. 686 F.3d at 1149–50 ("[T]he subordinate economic entity test is inapplicable to entities which are legally distinct from their members and which voluntarily subject themselves to the authority of another sovereign which allows them to be sued."); id. at 1158 (Gorsuch, J., concurring) (explaining that there is no need to apply the subordinate economic entity test to entities incorporated under the laws of a second sovereign because "[w]e can easily tell whether an entity like that is 'separate and distinct from the tribe' by looking to the laws of the second sovereign"). The Oklahoma statute at issue in Somerlott provides in relevant part: "A limited liability company formed under the Oklahoma Limited Liability Company Act is a separate legal entity, the existence of which as a separate legal entity continues until cancellation of the limited liability company's articles of organization and completion of its winding up, if any." 18 Okla. St. Ann. § 2004. The South Dakota statutes at issue in this case, by contrast, make clear that MIS, as an entity administratively dissolved more than two years ago, cannot be sued. See SDCL §§ 47-24-13.2, 47-26-39.

extent "necessary to wind up and liquidate its business and affairs," SDCL § 47-24-13.2, and cannot be sued more than two years after its dissolution, id. § 47-26-39.

Here, the Tribe created the Board under tribal law when it approved the MIS constitution. Doc. 8-1. And the Board's role under the MIS constitution shows that it shares a close relationship with the Tribe. Indeed, the MIS constitution makes the Board the governing body of Marty Indian School, Inc., which is itself a "legal entity of the Yankton Business and Claims Committee." Doc. 8-1 at 2, 14. The first factor—the entity's method of creation—weighs in favor of extending sovereign immunity to the Board.

### 2. Purpose

The Board's purpose also favors sovereign immunity. The Tribe created Marty Indian School, Inc. "for the purpose of maintaining and continually upgrading the educational process for the students of the Marty Indian School." Doc. 8-1 at 2. The Tribe delegated its authority to Marty Indian School, Inc. to accomplish this purpose. Doc. 8-1 at 2. The Board is the governing body of Marty Indian School, Inc., has the "sole and exclusive right to the management and administrative control of the Marty Indian School system," and establishes policy for the School. Doc. 8-1 at 2, 14. In short, the Board exists to provide a governmental service to Tribal members, and this supports a finding that it serves as an arm of the Tribe. See Hagen, 205 F.3d at 1043 (holding that a tribal college created to provide education to tribal members on Indian land was entitled to sovereign immunity because it "serve[d] as an arm of the tribe and not as a mere business"); J.L. Ward, 842 F. Supp. 2d at 1176 (finding that the purpose factor weighed in favor of sovereign immunity where the entity's function was closer to that of a tribal government than a business).

### 3. Tribal Control

15

The third factor—the structure, ownership, and management of the entity, including the level of tribal control—favors sovereign immunity. Membership on the Board is limited to Tribal members or Native Americans living on the Yankton Sioux Reservation. Doc. 8-1 at 3. The Tribe elects the Board, Doc. 8-1 at 5, and can remove Board members through a recall election, Doc. 8-1 at 4. Although the Board has authority to operate the Marty Indian School, the Tribe cabined this authority through the MIS Constitution and Bylaws. Those documents specify the powers and responsibilities of the Board, Doc. 8-1 at 2–3, 7–15, and the Board cannot amend them without approval from a majority of the Yankton Sioux Business and Claims Committee, Doc. 8-1 at 9, 15.

### 4. The Tribe's Intent to Extend Sovereign Immunity to the Board

The Board argues that §§ 1-8-4 and 1-4-7.2 of the Yankton Sioux Tribal Code establish that the Tribe and its "enterprises" have sovereign immunity. Section 1-8-4 is the Tribal Code's general provision on sovereign immunity. It provides that:

> Except as required by federal law, or the Constitution and By-Laws of the Yankton Sioux Tribe, or specifically waived by a resolution or ordinance of the Tribal Council specifically referring to such, the Yankton Sioux Tribe shall be immune from suit in any civil action, and its officers and employees immune from suit for any liability arising from the performance of their official duties.

Doc. 8-4 at 5. Section 1-4-7.2 states that "[n]othing contained . . . in this Code shall be construed as a waiver of the sovereign immunity of the Tribe or its officers or enterprises unless specifically denominated as such." Doc. 8-4 at 4.

The Tribe's intent to extend sovereign immunity to the Board is not as clear as it might be. In some cases, the tribal law creating the entity expressly states that the tribe wants the entity to possess immunity. See Williams, 929 F.3d at 184. The MIS Constitution and Bylaws make no such express statement. At the same time, however, the Tribe took care to designate MIS as a

16

legal entity of the Tribe, Doc. 8-1 at 2, Marty Indian School, Inc. as a legal entity of the Yankton Business and Claims Committee, Doc. 8-1 at 14, and the Board as the governing body of Marty Indian School, Inc., Doc. 8-1 at 2. Making the Board the governing body of a Tribal entity suggests that the Tribe views the Board as part of the Tribe or as a tribal "enterprise" or entity entitled to sovereign immunity. The tribal intent factor militates in favor of extending sovereign immunity to the Board.

### 5. Financial Relationship Between the Board and the Tribe

This factor generally concerns how a judgment against the entity would affect the tribe's treasury. Williams, 929 F.3d at 184–185. The question is not whether the tribe would be directly liable for the judgment, but rather whether the judgment could "significantly impact" the tribe's coffers. Id. Courts have found that this factor favors sovereign immunity where the entity receives federal funding because of its relationship with the tribe and uses that funding to provide a governmental service like education or health care to tribal members. See Manzano v. S. Indian Health Council, Inc., No. 20-cv-02130-BAS-BGS, 2021 WL 2826072, at *10 (S.D. Cal. July 7, 2021) (holding that this factor favored extending sovereign immunity to a corporation formed by seven tribes to provide health care to tribal members where the corporation received federal funding because of authorization by the tribes and that funding benefited the tribes' "interest in the health and welfare of its members and in their own self-governance"); Matyascik v. Artic Slope Native Ass'n, No. 2:19-cv-0002-HRH, 2019 WL 3554687, at *5 (D. Alaska Aug. 5, 2019) (finding that this factor favored extending sovereign immunity to tribal consortium formed to provide healthcare to tribal members where the consortium's "core funding comes from tribally-authorized federal funding that it receives on behalf of its member tribes" and a judgment against the consortium would divert these funds from health care services); McCoy v. Salish Kootenai Coll.,

Inc., 334 F. Supp. 3d 1116, 1123–24 (D. Mont. 2018) (finding that this factor favored extending sovereign immunity to a tribal college where the college would not have received federal funding were it not for being chartered and sanctioned by the tribes, the tribes contributed financially to the college, and the college's financial stability was "critical to the Tribes['] objective to maintain their self-sufficient society").

The Bureau of Indian Education provides grants to MIS as a "tribally controlled school" as that term is defined in the Tribally Controlled Schools Act.[11]  25 U.S.C. § 2511(9); Doc. 1 at ¶ 5; see also Marty Indian Sch. Bd., Inc. v. South Dakota, 824 F.2d 684, 685 (8th Cir. 1987) (explaining that the federal government funds MIS).  The Board uses these federal funds to operate MIS and educate Tribal children.  Doc. 8-1 at 13–14; 25 U.S.C. § 2502(a)(3) (explaining how school boards of tribally controlled schools may use federal grants).  According to the Board, a judgment in Stathis's favor would deplete its treasury and "directly impact[] the funds on which [the] Tribe depends to" educate its children.  Doc. 7 at 10.  And even if the Tribe wouldn't be directly liable for a judgment against the Board, that judgment would still negatively affect tribal members by reducing the funds used to operate MIS.  The financial relationship between the Tribe and the Board favors sovereign immunity.

### 6. Policies Underlying Sovereign Immunity

This last factor also favors extending sovereign immunity to the Board.  The policies underlying sovereign immunity include tribal self-determination and cultural autonomy. Breakthrough, 629 F.3d at 1188; Am. Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d 1374, 1378 (8th Cir. 1985).  Congress has made clear that having Native

---

[11]Stathis in his verified complaint stated that the Board "received federal funding vis-à-vis Bureau of Indian Education School Grants issued pursuant to 25 U.S.C. § 2504."  Doc. 1 at ¶ 5.  Section 2504 is part of the Tribally Controlled Schools Act.

American communities and tribes control the education of their children promotes both of these policies. For instance, the Tribally Controlled Schools Act states that Congress desires "to assure maximum Indian participation in the direction of educational services," commits to establishing a "meaningful Indian self-determination policy for education," and acknowledges that "Indian people have special and unique educational needs, including the need for programs to meet the linguistic and cultural aspirations of Indian tribes and communities." 25 U.S.C. § 2501(a), (b), (d)(2). The Self-Determination Act likewise expresses Congress's commitment to fostering self-determination by "assuring maximum Indian participation in the direction of educational . . . services to Indian communities." 25 U.S.C. § 5302(a); see also 25 U.S.C. § 5301(b)(3) (finding that "parental and community control of the educational process is of crucial importance to the Indian people"). If these statements from Congress left any doubt, the Eighth Circuit recognized over thirty years ago that the Tribe sought to "promote Indian self-determination by creating and operating" MIS. Marty Indian Sch. Bd., 824 F.2d at 687. Refusing to extend immunity to the Board has the potential not only to limit the Tribe's autonomy, but also to reduce the funds available to operate MIS and in turn impact the Tribe's ability to provide the education necessary to achieve self-determination.[12] See id. at 688 (reasoning that allowing South Dakota to tax fuel purchased and used by MIS for school purposes would frustrate the federal interest in tribal self-determination by depleting the funds used to run MIS). The Board has shown that it is an arm of the Tribe entitled to sovereign immunity.

## C. The Board Did Not Waive its Sovereign Immunity

---

[12]This is not to say that MIS paying the rest of what Stathis claims is owed on the employment contract would undermine tribal self-determination and autonomy. A determination of entitlement to sovereign immunity does not turn on the amount of money at stake in the particular case.

An immune tribal entity may still be sued if "Congress has authorized the suit or the [tribal entity] has waived its immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). Stathis makes four arguments for waiver, but none are convincing.

Stathis argues first that the Board waived its sovereign immunity by stating in his employment contract that "[a]ny matter by [sic] controlled by the By-laws and Policies and Procedures will be controlled by the laws of the State of South Dakota." Doc. 8-3 at 2. In Stathis's view, this sentence means that South Dakota law governs his claims.

A contractual waiver of sovereign immunity doesn't require any "magic words," Rosebud Sioux Tribe v. Val-U Constr. Co. of S.D., 50 F.3d 560, 563 (8th Cir. 1995) (cleaned up), but it must be "clear," C & L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe, 532 U.S. 411, 418 (2001) (cleaned up and citation omitted). There was no clear waiver here. The sentence Stathis relies on appears in the contract's section on school law:

> SCHOOL LAW. The School Board is an entity of the Yankton Sioux Tribe, and is not bound by the laws of the State of South Dakota. The By-laws and Policies and Procedures Manual of the School Board shall be binding and controlling on the parties and shall control the conduct of the operation of the school. Any matter by [sic] controlled by the By-laws and Policies and Procedures will be controlled by the laws of the State of South Dakota. If any ambiguity or question as to whether the laws of the State of South Dakota or the By-laws and Policies and Procedures Manual of the School Board is controlling shall arise, the By-law and Policies and Procedures of the School Board shall be binding and controlling. The exceptions to South Dakota School Law includes, but is not limited to, the following matters, to wit: Administrator or Supervisor Retirement, School Calendar, Continuing Contract and Tenure, and Conflict of Interest. Nothing herein shall be construed to constitute and [sic] acceptance by the School Board of the jurisdiction of South Dakota courts.

Doc. 8-3 at 2–3. Reading this paragraph as a whole, it appears that there exists a typographical error and that the sentence Stathis points to should read "[a]ny matter *not* controlled by the By-

laws and Policies and Procedures will be controlled by the laws of the State of South Dakota." Regardless, this sentence is not a clear waiver of sovereign immunity when the paragraph in which it appears specifically states that the Board is not bound by South Dakota law and does not consent to the jurisdiction of South Dakota courts.

Stathis's next argument is that tribal sovereign immunity should be abandoned or limited to allow suits such as his to be heard in federal court. But this is not the first case where sovereign immunity barred a non-Indian's employment claims against a tribe or tribal entity, and it likely will not be the last. See, e.g., Hagen, 205 F.3d at 1043 (holding that sovereign immunity barred employment discrimination lawsuit brought against a tribal college); Dillon, 144 F.3d at 583–84 (holding that sovereign immunity barred employment discrimination claims asserted against a tribal housing authority); Ferguson v. SMSC Gaming Enter., 475 F. Supp. 2d 929, 930–31 (D. Minn. 2007) (holding that sovereign immunity barred the plaintiff's discrimination claim against his former employer, a tribal entity). Although this result seems unfair to Stathis, this Court has no authority to abandon or limit tribal sovereign immunity as Stathis requests. Bay Mills Indian Cmty., 572 U.S. at 800 ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity."); Stanko, 916 F.3d at 697 (stating that "it is too late in the day, and certainly beyond the competence of this court, to take issue with a doctrine so well-established" as tribal sovereign immunity (cleaned up and citation omitted)).

Stathis's last two arguments concern his allegation that the Board held itself out as a South Dakota nonprofit corporation "at all times relevant to this action." Doc. 1 at ¶ 4. This allegation seems to be based on the contract's statement that the Board was a "non-profit South Dakota corporation." Doc. 10 at 8–9. Stathis argues that this makes the Board liable under SDCL § 47-22-73, which provides that "[a]ll persons who assume to act as a corporation without authority so

21

to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." Alternatively, he claims that the Board waived its sovereign immunity under the "waiver by estoppel doctrine." Doc. 10 at 9.

Stathis's arguments suffer from at least two problems. First, the contract's statement that the Board was a "non-profit South Dakota corporation" does not justify estoppel when the contract also stated that the Board was an entity of the Tribe, was not bound by South Dakota law, and did not consent to the jurisdiction of "South Dakota courts." Doc. 8-3 at 2–3. Moreover, this Court in J.L. Ward held that an entity could claim sovereign immunity despite being a South Dakota nonprofit corporation. 842 F. Supp. 2d at 1177. Second, courts have rejected arguments that misrepresentations by tribal officials can estop tribes from asserting sovereign immunity. See Native Am. Distrib. v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1295 (10th Cir. 2008) (holding that a tribal entity was not equitably estopped from asserting sovereign immunity even though the managers of the entity had told the plaintiffs that the entity could be sued); id. ("[T]he misrepresentations of the Tribe's officials or employees cannot affect its immunity from suit."); Whiteco Metrocom v. Yankton Sioux Tribe, 902 F. Supp. 199, 202 (D.S.D. 1995) (explaining in dicta that estoppel was an "insufficient basis from which to find that the Tribe expressly waived its sovereign immunity," even though the tribe's casino manager represented to the plaintiffs that the casino was incorporated under South Dakota law).

### D. Stathis Fails to State a Claim Under 42 U.S.C. § 1981

Stathis's only federal cause of action is his retaliation claim under 42 U.S.C. § 1981. As explained more fully below, Stathis fails to state a claim under § 1981 because that statute does not apply to the Board, and he has not pleaded enough facts to make it plausible that he engaged in protected activity.

### 1. Section 1981 Does Not Apply to the Board

Section 1981 functions to "protect[] the equal right of 'all persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006) (cleaned up) (quoting 42 U.S.C. § 1981(a)).   In the employment law context, § 1981 is closely related to Title VII of the Civil Rights Act of 1964. CBOCS W., Inc. v. Humphries, 553 U.S. 442, 455 (2008) (recognizing a "necessary overlap between Title VII and § 1981" (cleaned up and citation omitted)); Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997) ("Title VII and § 1981 set forth parallel, substantially identical, legal theories of recovery in cases alleging intentional discrimination in employment on the basis of race.").   Both statutes "prohibit employers from retaliating against employees for opposing racial discrimination," and both statutes require plaintiffs alleging unlawful retaliation to prove the same elements.  Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013) (explaining that the elements of a Title VII and § 1981 retaliation claim "are identical" (cleaned up and citation omitted)).

As relevant here, Title VII specifically exempts Indian tribes from complying with its prohibition against employment discrimination.  42 U.S.C. § 2000e(b).  Entities closely related to a tribe may also qualify for this exemption, even when the entity is incorporated under state law. For example, the Tenth Circuit held that Title VII's Indian-tribe exemption applied to a nonprofit state corporation that operated educational programs for a tribe under the Tribally Controlled Schools Act.  Jim v. Shiprock Associated Schs., Inc., 833 F. App'x 749, 750–52 (10th Cir. 2020). The Tenth Circuit found that the entity was exempt from Title VII for largely the same reasons this Court found that the Board is entitled to sovereign immunity: the entity had an educational purpose and served the tribe, acted through a school board composed of tribal members, was

accountable to the tribe, followed tribal law, oversaw schools populated by tribal students and staffed by tribal members, and received federal funding because of its service to the tribe. Id. at 750–52. Similarly, this Court held that the Indian-tribe exemption applied to a school board that, while incorporated under South Dakota law as a nonprofit, was tribally chartered and formed with the authorization of the tribe, required to comply with tribal law, composed of elected tribal members, created to further the education of tribal children, and contracted with the BIA under the Indian Self-Determination and Education Assistance Act. Giedosh v. Little Wound Sch. Bd., Inc., 995 F. Supp. 1052, 1057–59 (D.S.D. 1997); see also Pink v. Modoc Indian Health Project, Inc., 157 F.3d 1185, 1188 (9th Cir. 1998) (holding that a nonprofit corporation created and controlled by two Indian tribes was exempt from Title VII).

Under Jim and Giedosh, the Board would fall within Title VII's Indian-tribe exemption even if it were still a South Dakota nonprofit corporation. Of course, Stathis is suing under § 1981, not Title VII. And § 1981 does not have a specific Indian tribe exemption. But that does not mean that § 1981 gives Stathis a cause of action against the Board for employment discrimination. In Wardle v. Ute Indian Tribe, the Tenth Circuit held that § 1981 did not provide a federal cause of action to a former tribal employee allegedly fired for not being a tribal member. 623 F.2d 670, 672–73 (10th Cir. 1980). The Tenth Circuit reasoned that Title VII's specific exemption of Indian tribes controlled over the more general language in § 1981 and other civil rights statutes. 623 F.2d at 672–73; see also Taylor v. Ala. Intertribal Council, 261 F.3d 1032, 1035 (11th Cir. 2001) (per curiam) ("In our view, it would be wholly illogical to allow plaintiffs to circumvent the Title VII bar against race discrimination claims based on a tribe's Indian employment preference programs simply by allowing a plaintiff to style his claim as a § 1981 suit."). In Dillon, the Eighth Circuit cited to Wardle when explaining that even if a tribal housing authority had waived its sovereign

immunity, a former employee claiming that the authority fired him because he was white "failed to allege a cause of action" against the authority under § 1981. Dillon, 144 F.3d at 584 n.3.[13]

Neither Dillon nor Wardle concerned nonprofit entities incorporated under state law. However, the reasoning in those cases logically extends to an entity like the Board, even if the Board was a South Dakota nonprofit corporation or was not entitled to sovereign immunity under the arm-of-the-tribe test. In other words, Stathis does not have a cause of action against the Board under § 1981, regardless of his arguments about sovereign immunity and the Board being a South Dakota corporation.

### 2. Stathis Failed to Plausibly Allege That He Engaged in Protected Activity

To establish a retaliation claim under § 1981, Stathis must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally connected to his protected activity. Sayger v. Riceland Foods, Inc., 735 F.3d 1025, 1030–31 (8th Cir. 2013); Wright, 730 F.3d at 737.

Stathis has not pleaded sufficient facts to make it plausible that he engaged in protected activity. "The term 'protected activity' refers to action taken to protest or oppose" actions made unlawful by Title VII or § 1981. Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000), superseded on other grounds by Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85; see also Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 684 (8th Cir. 2012) (explaining that protected activity "is defined by federal law, which prohibits a defendant from discriminating against an employee who has opposed any practice made unlawful by Title VII, or made a charge,

---

[13]The Fourth Circuit has held that Title VII's exemption for Alaska Native Corporations did not immunize such corporations from suit under § 1981. Aleman v. Chugach Support Servs., Inc., 485 F.3d 206, 210–13 (4th Cir. 2007). However, the Eighth Circuit in Dillon indicated its approval of the rationale in Wardle. Dillon, 144 F.3d at 584 n.3.

testified, assisted, or participated in any manner in an investigation, proceeding or hearing under the statute" (cleaned up and citation omitted)).  Stathis alleges in his complaint that he was "a racial minority in the context of his employment with the" Board, and that he engaged in protected activity when he "design[ed] a system in which Bureau of Indian Affair grant funds were utilized in a manner consistent with the specific intent of said funds." Doc. 1 at ¶ 37.  Nothing in Stathis's complaint suggests that his designing a system for administering the grant funds constituted participation in a proceeding under a federal employment statute, opposition to an unlawful employment practice under Title VII, or opposition to discrimination in the making and enforcing of contracts.  Nor does Stathis's brief even attempt to explain how his design of the system could qualify as protected activity.  Stathis's allegation that he engaged in protected activity by designing the system constitutes a "naked assertion[] devoid of further factual enhancement," and is therefore insufficient to state a claim. Iqbal, 556 U.S. at 678 (cleaned up and citation omitted).

### E.  Stathis's State Law Claims

In his complaint, Stathis alleges claims for wrongful termination, breach of employment contract, and breach of settlement agreement, invoking this Court's diversity of citizenship jurisdiction.  Doc. 1.  Under 28 U.S.C. § 1332, this Court has jurisdiction over disputes between citizens of different states where $75,000 "exclusive of interest and costs" is at stake.

In its motion to dismiss, the Board argued that Stathis's contract—which sets his salary at $70,000 and says his employment ends on June 30, 2018—establishes that the amount in controversy does not exceed $75,000.  This argument appears to be correct as to Stathis's breach of employment contract and breach of settlement agreement claims, and indeed Stathis seeks only "an amount equivalent to the remainder of [his] contract at the time of his termination" under these counts.  Doc. 1 at 8.

Count Two, Stathis's claim for wrongful termination, is the only count that could potentially put the amount in controversy over $75,000. Under that count, Stathis seeks lost wages for the time between his termination and his new job, relocation expenses, and general damages. Doc. 1 at 8. In South Dakota, "retaliatory discharge is a tort arising from a breach of public policy duties independent of the employment contract." Tiede v. Cortrust Bank, N.A., 748 N.W.2d 748, 752 (S.D. 2008). To succeed on a retaliatory discharge claim, Stathis must show that the Board's motivation for terminating him violated a "substantial public policy." Harvey v. Reg'l Health Network, Inc., 906 N.W.2d 382, 396 (S.D. 2018) (citation omitted). Whether Stathis's termination violates South Dakota's public policy is a question of law. Niesent v. Homestake Mining Co. of Cal., 505 N.W.2d 781, 783 (S.D. 1993). "Substantial public policies are 'found in the letter or purpose of a constitutional or statutory provision or scheme, or in a judicial decision.'" Semple v. Fed. Express Corp., 566 F.3d 788, 792 (8th Cir. 2009) (quoting Niesent, 505 N.W.2d at 783). The South Dakota Supreme Court has recognized a breach of public policy where the employer terminates an employee for: (1) refusing to commit a criminal or unlawful act; (2) filing a worker's compensation claim; and (3) whistleblowing that promotes the public good. Dahl v. Combined Ins. Co., 621 N.W.2d 163, 166–67 (S.D. 2001). Here, Stathis alleges that the "specific intent that the Bureau of Indian Affairs grant funds be utilized to provide performance bonuses to school staff that 'directly contribute to increased student achievement' represents a clear statement and mandate of public policy." Doc. 1 at ¶ 41. Stathis does not cite any statute, regulation, or judicial decision establishing a substantial public policy that the grant funds had to be administered in the manner he determined. Rather, he merely cites to a grant application MIS submitted for fiscal year 2015. Doc. 1 at ¶ 11; Doc. 1-2.

Ultimately, this Court need not decide whether it has diversity jurisdiction or supplemental jurisdiction over Stathis's state law claims, because this Court concludes that the Board has tribal sovereign immunity from such claims here.

IV.     **Conclusion**

For the reasons stated above, it is hereby

ORDERED that the Board's Motion to Dismiss, Doc. 6, is granted.

DATED this 17ᵗʰ day of September, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

28